Will the clerk please call the next case? 322-0174, Ray Mary Joyce Rabbit, an affidavit by Robert Black and Gordon Topello, found by Christopher Zeruba. Mr. Zeruba, you may proceed. Thank you. Good morning, rather good afternoon, both to the court and the council. Mr. Black, Mr. Corey, and Ms. Muselich. May it please the court, my name is Christopher Zeruba, along with Brett Williamson. We represent the appellate, Dr. Gordon Topello. Dr. Topello's appeal comes before you today originating from his pre-decree dissolution of marriage proceeding resulting in a January 3, 2022, ruling from the trial court. In December 2021, Dr. Topello and his wife reached a number of agreements regarding property allocation. Unfortunately, their dissolution of marriage was not fully resolved in the sense that issues relating to parenting time, decision making, and child support relating to their young son, Justin, remained unresolved. Given that, the trial proceeded in December 2021, and on January 3, 2022, without any oral ruling, the court issued its written ruling on that date. Unfortunately, the court's allocation judgment of January 3, 2022 contains two significant layering errors, both in its allocation of parenting time and in its allocation of decision making, specifically in the area of the allocation of religious upbringing. Both errors are against the manifest weight of the evidence. Let me first discuss and go through the issue of parenting time. I know that's the reverse order of my client's brief, but I do think it's more appropriate for purposes of this argument. The trial court heard testimony from a number of witnesses. One of the most important witnesses the trial court heard from was Attorney Chuck Roberts. Chuck Roberts was the guardian at lightning that was appointed in this case. He was appointed very early on in this case. Mr. Roberts is a veteran of over 40 years of representing children as an expert witness on behalf of the court. Mr. Roberts testified. He provided an oral report to the court. He recommended an equal parenting time schedule with alternating weekends, which is important, as well as an alternating holiday schedule, which is also important. It's also noteworthy that the guardian at lightning to the court made a specific note and testified that he thought each parent, and I quote, each parent, should be allowed to celebrate on Sundays as they see fit. Another important witness that the trial court heard was another expert witness of the courts, their 60410B expert, Dr. Roger Hatcher. Much like Mr. Roberts, Dr. Hatcher is an expert and has been for quite a long period of time, over 40 years experience. He also testified and recommended an equal parenting time schedule, recommended an alternating weekend schedule, testified and recommended an alternating holiday schedule. Dr. Topalo, my client, also testified. He requested an equal parenting time schedule, as well as an alternating holiday schedule. The court also heard from Dr. Topalo's wife and her retaining hired expert as well, Dr. Blackman. Not surprisingly, Dr. Topalo and his wife had different suggestions as to how parenting time should go. However, it is noteworthy that both his wife and her own expert testified to the court, and Dr. Rabat also requested an alternating holiday schedule, an alternating weekend schedule, the same as her expert. Holiday, alternating, weekend, alternating. Despite all of this testimony and all five witnesses who testified to the court regarding a parenting time schedule, the evidence presented to the trial court, in its totality, went against what the open ruling was. The court went against its own experts, went against all of its own witnesses, and went against the manifesto weight of the evidence. Instead, the court, in its January 3, 2022, application judgment, decided and allocated a parenting schedule for my client, which in week one would begin on Sundays in the evening at 6 p.m. until Wednesdays in the evening at 6 p.m. The following week, a flip of that schedule, beginning at 6 p.m. on Wednesdays and concluding not on Sundays, but on Saturdays at 6 p.m., essentially eliminating full weekends for Dr. Topalo and his son. The court also failed to allocate certain things that come along with having Sunday parenting time with a child. That includes Father's Day, which is upcoming this weekend. That includes Easter, which falls on a Sunday. Not one witness testified in this trial that Dr. Topalo should be excluded from exercising parenting time with his son on Sundays. Not one witness testified that Dr. Topalo should be excluded from exercising parenting time on Father's Day. Not one witness testified that Dr. Topalo should be excluded from exercising parenting time on Easter with his son. Now, I'm not here to argue that the court is required and it's necessary for the judge to follow expert testimony. Although, in this case, that expert testimony was detailed, unrebutted, and supported. Let me ask this question so that we're on the same page and it's clear. You're wanting, say, an alternating weekend schedule in this allocation, am I correct? Correct. Which, what would that be? What would that look like? That would contain a full weekend, which I believe is actually described in some regard by my client's now ex-wife, which would be a Friday through Sunday weekend. Unfortunately, the trial court did not do that. For example, 6 p.m. Friday to 6 p.m. Sunday? That could be something that would exist, correct. Another alternative would be going through Sunday and having the exchange be on Monday instead. Okay, thank you. The court did not have to necessarily follow the expert advice. Again, that said, the recommendations and the testimony was fully supported. But in going against all of the evidence, the totality of it that was presented to it, the trial court would have to, at an absolute minimum, provide a basis for why it allocated such a schedule. There was no witnesses that provided the schedule in which the court willfully decided upon. The court didn't provide a basis because the court could not provide a basis. It could not provide a basis because, as this court will see in the transcripts, the allocation of parenting time which ultimately eliminated this alternate weekend schedule and its elimination of Sunday parenting time deprived my client of these necessary quality time. Once their son gets older, there's going to be time where obviously during the week he's going to be in school. There's going to be Father's Day, there's going to be Easter, there's going to be additional time. Yet no one testified to the schedule in which this trial court determined. So how or why did this trial court come to its ruling? The only basis that can be presumed is that this court made that decision based on its subsequent allocation of religious upbringing sole decision-making to my client's now ex-wife and not my client. That's the only plausible explanation. Unfortunately, that allocation is also flawed. There's also an error, and that error is also against the benefit of this weight of the evidence. In applying Section 602.5 of the Illinois Marriage and Dissolution of Marriage Act, that is the statute which allows the court to allocate certain significant decision-making in education, health care, religion, and extracurricular activities. As part of that statute, there is a subsection that allows the court to look at, and not limit, but look at 15 specific factors that the court has to determine which is in the best interest of a minor child in allocating certain decision-making, those four major significant decisions. The difference between religion and education, medical, or extracurricular activities is that religion also has its own separate subsections. The court does not, in any part of its ruling, make any reference to those subsections. To the religion? Well, to religion, or quite frankly, any of the allocation of significant decision-making to the parties. There's no reference to any of the factors for health, for education, for extracurricular, or religion. My point, my argument as far as the error for religion is that not only were the factors not brought up, but the court couldn't do that because when you look at the actual distinct subfactors contained in the religious component, they cannot be applied when looking at the actual testimony and evidence provided to this court. To that point, Your Honor, if you look at the first subsection, it says the court shall, and being justices, judges, attorneys, words matter. Certain things like shall or shall not, those are pretty important things in a statute. The statute reads that the court shall allocate decision-making responsibility for the child's religious upbringing in accordance with any express or implied agreement between the parties. Not one witness testified to any express or implied agreement between these parties in relation to the religious upbringing. This child, at the time that the party separated, was 10 months old. My client's now ex-wife withheld that child. There was the appointment of a guardian of light and an appointment of a custody evaluator. Different steps and different temporary orders that existed throughout this long, drawn-out process that finally got us to trial. But at 10 months old, a child can't verbally communicate. The child wasn't baptized. There was no implied agreement between the parties. If anything, my client's wife testified that, in her belief, my client was actually in dislike or hatred of her religion. Now, the guardian of light... Are you saying that the trial court can only address the religion component if there's an implied or express agreement? No, Your Honor. What I'm saying is that there is an analysis that the court has to go through. First, the court has to look, see if there was an implied or express agreement that existed. If there was, between the parties, then the court shall designate and shall allocate based on that implied or express agreement. Do you believe there was one? No. So, on this record, it's clear from, I think, the evidence, there wasn't, correct? Correct, Judge. No, okay, so... Correct. But the court can then proceed to address that factor and make a ruling. Not exactly, Judge. What I would say is that's the first step in the three-step analysis. After that, the court has heard that there's no express or implied agreement. The next step at that point, then, is, okay, well, then, what is the course of conduct, or has there been a course of conduct between these parties in relation to the religious upbringing of their son? And if there has been a course of conduct, then the court is then directed at that point that they shall consider that evidence, shall consider the evidence. They don't have to necessarily follow that evidence. They shall consider that evidence in determining their allocation. Again, much like... How expansive is course of conduct? Isn't there a clear disagreement between the parties?  And is that disagreement a course of conduct regarding that factor? I think to some degree, Judge, but I think when we actually look at what is... I would agree with the court in what the question states as far as, yes, there was a disagreement. If you look at the actual facts of that disagreement, though, I think that actually puts things in better context. Right? We have two individuals, both who practice under the Christian faith. I think that could go towards a course of conduct. Did you say practice? Yes, Judge. Does the evidence support the practice there? Yes, Judge. Give me the evidence. Sure. Both individuals, both parties, including my client, indicated that although there are different sects of Christianity, that both individuals testified that they do practice under that faith. I know that there is a line... I guess I'm asking what constitutes practice. I guess that... Attending that church? That could be a method of practicing. Correct, Judge. Is there any evidence that suggests that your client did? That my client did attend church? Yes, Judge. Not necessarily with the child, mind you, but I would indicate that I think that is an important part to note because, again, at the onset of this case, my client's son was 10 months old. Now, there was disagreements between the parties that obviously... I mean, perhaps not obviously, but that's what was testified to during the course of this case. But doesn't this subset all fall under decision-making, responsibility, authority, or right of one parent versus another parent on that subset of activity? I think if there was a course of conduct that would follow where one parent was given essentially part blanche as far as their ability to raise a child under a certain faith, if one parent is raised in the Jewish faith and another parent is raised under Catholicism and that parent who is Jewish decides, you know what, despite my own faith, I'm going to allow my child to be raised in the Christian Catholic faith, by all means, that could be a course of conduct in which they're saying, hey, look, I'm stepping back, I'm letting this other parent kind of... Well, that would be an agreement. It would, I guess, would fall under both subsections, Judge Jackson. In this specific aspect as far as the course of conduct, the problem that does exist here, Judge, is that it's the course of conduct in raising a child. This child, and I guess particularly my client, were both deprived of one or the other based on the temporary orders that had existed based on initial accusations that were raised against my client. So, unfortunately, my client was put in a position where he, throughout this process, as it led up to this trial, had to continually claw back time to be able to spend time with his son, which ultimately would have resulted in him being able to exercise the same religious, although different perhaps, but the same religious experiences as his wife was able to do on Sundays. Your time is up. You will have time in reply. Questions from the panel? I do. So you were, I don't think you got to in the argument, Counsel, but 602B3 subsection C is where we find our answers. Is that what you're suggesting? That is exactly where I was going to direct the court to look at, Judge, yes. Thank you. You will have time in reply. Thank you. Counsel Black, you may respond. Thank you, Your Honor. May it please the Court, Counsel, my name is Bob Black, Robert G. Black. I have the privilege and pleasure of representing the Ipley Dr. Joyce Rabat this afternoon. One thing I didn't hear during all this is some of the more particular aspects of the evidence of record. So we were talking about, Counsel was talking a little bit about express or implied agreement. There is evidence in the record that Dr. Roger Hatcher testified that the parties agreed that during marriage and after marriage that Joyce would be primarily responsible for the child's religious aspects. If not an express agreement, it's certainly an implied agreement, and that fits within that prong right there. Dr. Blackman also said Joyce was the most involved and most dedicated to the religious point of view, and he recommended that Joyce hold major decision-making for religious upbringing. So there was other evidence of record and testimony of record. There was an assertion just made that the appellant frequented church or went to church, and we have quoted in our brief from the record where he was asked if he has, let me make sure I find the right page here, he was asked if he had, whether he's a member of the church and he'd been going to a church, and he said, no, not since marriage, that would be about right, was his quote. So there are indications of record here that more than amply support what the trial court ruled. And one thing I didn't hear is that when we're dealing with the Senate and we have the factors, my mouth's getting dry, and we have the factors under both sections. I'm looking at those factors. We are to presume that the court knew the law, recognized the law, and applied the law, and there's a big burden to show that the court did not do so. And here what the court said in its ruling is it had the opportunity to observe the testimony, to meter in credibility the witnesses and the parties, and to weigh the evidence before the court, and it made its determination expressly on the best interest of the child upon full consideration of all relevant evidence, along with the arguments of counsel, and after consideration of the relevant statutory factors in sections 602.5 and 602.7. Now, what I kind of think I'm hearing is that if specific findings aren't made under all of those 15 factors under one and 17 factors under the other, that if there are not those specific factors there, then ipso facto it's against the manifest way, and that's not the law. And we've cited the case law that that's not the law, particularly in remarriage of Whitehead. That, well, okay, the court is not required to refer to every factor that makes this decision. It is not required to list out every factor. But the record here shows that there were factors in favor of the court's rulings. Now, the other thing I heard also was about that the experts or the witnesses testified about equal parenting time. Number one, the court doesn't have to follow any of those recommendations. It's within its own discretion how it's going to do that. And number two, okay, we've got all of these new concepts in the Act, okay? Yes. From some of the solar folks that used to be custody. Right. Okay, so is parenting time an equivalent of custody? Probably not. I'm not sure. But let's look at the facts in this case. Right. Is there equal time that's on the clock in the calendar? Yes, pretty close. Between these two parties. Pretty close to it. Because he has six overnight visits every two weeks. That's pretty darn close to equal, if I read things correctly and hear things correctly. How many weeks did you say? Every two weeks he has six overnights. Yeah, right, okay. So pretty close to being equal. There are considerations given to different holidays. Both parties are going to get two weeks of vacation time with the child each. There's no difference there. So it's all pretty much the same. The thing that they're talking about, I guess, right now, I heard something about Father's Day this morning or this afternoon, and I don't remember Father's Day. Well, I mean, it may be too simple in this case, but if you laser in on it, it's basically that Sunday, out of all the days of the week, seems to be a scheduling day for Father's Day, Mother's Day, Easter, et cetera, and that this schedule does not allow equality between the parties because you're saying every Sunday the child will be in the care, custody, and control of the mother. Am I correct? Right. And that second week or the first week, actually, the custody would be, custody, I'm going to use that word for right now, but is exchanged at 6 p.m. on Sunday through 6 p.m. Wednesday, and the following week is 6 p.m. Wednesday through 6 p.m. But that's every other Sunday, correct? Right. So this Sunday in particular, I don't know if you've done the math or if the parties know, but Father's Day is Sunday, obviously. Is the appellate going to have any time? I'm not sure about that. I can't answer that definitively. I'm not sure which week this would be. However, one thing I would like to point out for the Court is there's nothing in the statute, in the Act, that says each party or a party must have a full weekend, must be provided with a full weekend. If the General Assembly had wanted that, if it had made that important, if it had thought that was a big enough decision, it would have included it within the statutory language. It did not. I would speculate, or at least better than speculate, there are several instances where it's not all the way through a weekend or not Saturdays or not Sundays. But compounding it here is the fact that all of the record testimony went to the importance to Dr. Rabat of her church and her religious upbringing and the significance of that. There was no such testimony or evidence to the contrary or as to his religious upbringing. And, in fact, he testified he wasn't even going, or there was evidence that he was not even going to church or attending church. So that was a very significant factor overall in the Court's consideration. And, again, it is this consideration from the evidence within the manifest way of the evidence, did the Court abuse its discretion and so rule it? And we submit that there is more than ample evidence to support this pretty much almost equal parenting time. Now, you've given us in the second standard review abuse of discretion. Now, what is the standard? The standard review here, Your Honor, is manifest way because that's Well, let me come back for a second. They only talk about this being against the manifest way of the evidence. And manifest way is essentially the standard review. However, we've pointed out that they didn't say anything about abuse of discretion and to the extent any of the Court's factual findings that are manifest way that are considered whether within that the Court abuses discretion in its ruling from its factual findings, they didn't raise that, and that's forfeited. Okay. Let me just make sure. The difference in religions, the so-called difference in religions. Joyce is Catholic. Appellant says he was born Orthodox Catholic. Dr. Rabat practices in the Eastern Rite Catholic Church, which is basically the same thing as a Catholic church. There really is no difference here in terms of religion. It's just that Dr. Rabat has a much greater interest in attending religious services and following through on her religious upbringing. And you have to ask, I mean, what was demonstrated throughout the record is some of the intolerance towards Dr. Rabat's background. And the only issues that are raised here are the parenting time on a Sunday and the religious decision-making. Those are clearly the two most important factors to Dr. Rabat from the record. We, again, recited the Whitehead case that we believe is completely on point, where in Whitehead, the party asserted that the fact that the trial court didn't say anything about the statutory factors and it must not have considered the statutory factors, and the court said that's not good enough under these circumstances. For an example, the GAL there, in his report, analyzed all 17 factors and all the factors under the statute. And so the trial court had before it evidence of consideration of the factors, the statutory factors. Here there is also, likewise, clear record of indication of consideration of the factors. They are discussed by Mr. Roberts. They are discussed by Dr. Bluffman. They are before the court for consideration, and it's a large burden to try and overcome that case law that says the court is presumed to know the law and follow the law. And that's pretty basic. That's pretty basic. The court is not required to make specific findings or make a specific reference to each factor. Again, the presumption is the court follow the law, and that's in re-custody of GAL, which we also cited in the briefs. In terms of the individual factors, I think that we can see from the evidence, from the record, that there was evidence on the individual factors under the statute. And looking first at Section 602.5c, obviously the age of the child, the wishes of the child, you cannot figure out right now because the child was an infant and just grew up. But about the ability of the parents to cooperate in making decisions, the record is clear that there is not a whole lot of that. Close and willingness to foster a close and continuing relationship with the other parent, not a whole lot of indication of that also. Mental and physical health of all individuals, the court heard testimony about appellant's personality traits, let's say, and it considered that along with everything else. So there was a very sufficient record to support the court's findings under both statutes, both in terms of the religious upbringing and in terms of the parenting time. I believe that's the extent of what I wanted to bring to the panel. I'm happy to answer any other questions. Do you think, counsel, that a reasonable judge would have excluded Father's Day just to accomplish this religious goal? Again, I don't recall that Father's Day was brought to issue before I'm hearing it today. Be that as it may, I don't think that's sufficient to throw out the whole thing or to say that it shouldn't be the Sunday schedule as it is. Thank you. Will the Sunday schedule always prohibit the chosen client, the appellant, from being with the child on Father's Day in any given year or every year? As written, assuming it's the same weekend or that weekend, that by 6 p.m. on Sunday the father would be with the child. Every Sunday? If it's the every other Sunday, that's not Father's Day. To try to clarify, Father's Day doesn't always fall, does it? I don't know. On the same day? It's the third Sunday of June. Same Sunday in June. Yeah, third Sunday in June. The status is the appellant is guaranteed to not see the child at all on 50% of the Father's Days in theory, and then on the Father's Days he will start at 6 p.m. Sunday night. Again, I don't know how the two-week intervals fall and how that goes here factually. It's not something that I thought I'd be looking at in advance. However, there are, again, the fact that there is this issue with Father's Day or an issue with Father's Day is not enough to throw off everything else. Now, the trial court never got a chance, I don't believe, to consider a modification for Father's and Mother's Day, did it? There was a motion to reconsider that was filed, and that would be about the extent of how it was proposed. And along the last opposing counsel, did they present it to the court at that time? My recollection is from the motion to reconsider, they presented Easter and Good Friday. Right, right. So Father's Day is— Father's Day, I don't recall that being— The court never got an opportunity to consider— Never had the opportunity. Very good. Any others? Thank you, counsel. Any other questions? No. Thank you very much. Thank you, counsel. Thank you. Thank you, counsel. Counsel, you may reply. Mr. Garuba, as you're walking up, I'll start with my question regarding the last statement that was made. The trial court did not have an opportunity to address that. I know that the GAO, kind of sua sponte, filed an answer to your motion to reconsider, which seems unusual, and the court ended up striking that. But it was raised in that consideration, correct? It was, Judge. There was, I believe, subcommunications that existed prior to the filing. Subcommunications? I'm sorry, Judge. Did you say subcommunications? Subcommunications. Okay. Between the guardian ad litem and both parties' respective counsels, and that guardian ad litem did agree to sua sponte, did address the issue of Father's Day in that reply. So my question to you, because I would hate to contemplate reversing a trial, Judge, you did not have an opportunity to make a decision. Where will we find in the record your request for Father's Day? We know that you made a request for Easter and Good Friday. As far as our request, Judge, other than what you've mentioned as far as the guardian ad litem request, the trial court would not have. Thank you. And let me rephrase that. But for the testimony during the trial between my client, Dr. Hatcher, and Chuck Roberts, who was the guardian ad litem, who all indicated to the court their, actually I'm going to go further than that, even Dr. Abbott, my client's ex-wife, and her expert, also all indicated that they either requested or recommended an alternating holiday schedule. That includes my client and his ex-wife and his ex-wife's expert. What I would also. Reconsider these Mother's and Father's Day holidays, right? Yes, Judge. I would. I think that there is, at least in the practice of domestic relations, I think now with certain holidays and state days being off, and institute days, that is now a perhaps growing trend to have some more of these different holidays come in that said, yes, Father's Day, Mother's Day, certain religious holidays, Fourth of July, those type of things are included in an allocation judgment, historically and traditionally, Judge. To answer Justice Peterson's question as far as the Father's Day component, like my client, one does not have equal parenting time, and as Justice clearly stated, yeah, on just probably as many Father's Days, there will be no time with his son, Justin. On the other half, perhaps also equally, that time to start at 6 p.m. for dealing with a very young child would be fairly difficult to plan anything. You're not going to the zoo. You're not going to, I believe, going to the meaningful times a couple weeks ago. You're not doing something along those lines. You're maybe reading a book and going to bed. Going back to counsel indicated as far as the kind of two cases that were both cited, Sadler and Whitehead, you have a case in Whitehead which is significantly and distinctly different than the case at hand. You have a case in which the trial court did then send a letter to both counsels with its ruling which indicated in that and had the guardian of items report which listed out all the factors and the guardian of items analysis of those factors, no clear decision. I think it's very clear for an appellate court at that point to look at it and say, here's what the GAO said, here's factor by factor, here's what the judge did. I can see your position and looking at it and saying, okay, I know exactly what the trial court did. That doesn't exist here, particularly in the allocation of parenting time where you have every single witness, including my client's counterpart, saying we want an alternating weekend schedule. Every single witness, including my client's counterpart, saying we want an alternating holiday schedule, and yet we get a schedule and a holiday schedule that doesn't fit what any witness indicated. So it makes it very, very difficult to be in your shoes and be able to look at the transcripts and say, okay, how do we go from A to B, particularly when the judge does not cite the factors, does not cite his analysis as to how we got from A to B. That doesn't exist. That's exactly what the court, the appellate court rather, in Sadler indicates. Because you have to look at the full totality. You have to look at the full testimony. Just like when Mr. Black indicated, well, Dr. Hatcher said this as far as religion. Great, look at the entire testimony of Dr. Hatcher because Dr. Hatcher went beyond that. He also said that there was no significant difference in the parties' religious training and that both parties practiced, I believe Dr. Hatcher said Catholic and made a mistake in that sense, but they both practiced in the Christian faith. Going back to Your Honor's question originally when I was first up here regarding the course of conduct, I don't disagree with Mr. Black. I don't think that there's a whole lot of distinction between these parties' religions. I don't think that there's a whole lot of disagreement that existed beyond a wedding venue, beyond going to a church that may speak in a particular language or another. You have two individuals who practice under the same faith that could go to a course of conduct. Not necessarily to have some decision-making go to one parent. If anything, it should be jumped if the court was going to find that understanding, if the court was going to find that that actually did exist in this case between these parties. Your time is up. Any further questions? Thank you, counsel. Thank you, counsel, both for your arguments in this matter today. It will be taken under advisement and written disposition shall issue. The court will stand in brief recess.